## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 15 2015, 8:17 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cynthia M. Carter
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Angela N. Sanchez
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Samuel Hampton, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 15, 2015 <br><br> Court of Appeals Case No. 49A04-1410-PC-484 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marc Rothenberg, Judge <br><br> Trial Court Cause No. 49G02-0802-PC-44326 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Samuel Hampton (Hampton), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

## ISSUES

Hampton raises four issues on appeal, which we consolidate and restate as the following two issues:

(1) Whether the post-conviction court erred in denying Hampton's petition for post-conviction relief because Hampton was denied effective assistance of counsel; and

(2) Whether the post-conviction court abused its discretion by declining to compel specific discovery and by further imposing a protective order to prohibit Hampton from pursuing certain evidence.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to Hampton's conviction were set forth in this court's opinion in Hampton's direct appeal as follows:

> Around Christmas in 2007, six-year-old J.B. was visiting at the home of J.B.'s great aunt, Renita Glasco [(Glasco)], and Hampton, who was Glasco's boyfriend. At some point during that visit, while Glasco was sleeping on the couch in the home's living room, J.B. went from the living room into a bedroom where Hampton, who was forty-seven years old, was laying on the bed wearing a t-shirt and boxer shorts. After J.B. joined Hampton on the bed, Hampton pulled down J.B.'s underwear.

Hampton then "put his penis inside [J.B.'s] butt." Hampton's penis felt "hard and greasy," and Hampton "was shaking it." When Hampton's penis touched J.B., it made J.B. feel "[n]asty." Also around Christmas, J.B. told [Mother] that "her behind kind of hurt . . . her."

On January 12, 2008, J.B. "came out [of] the blue" and told Mother that "she had secrets to tell [her]." J.B. told Mother that Hampton had touched her. Mother then called the police.

On January 14, 2008, Indianapolis Police Detective Genae Gehring[-Cook] [(Detective Gehring-Cook)], a child abuse detective, met with Mother and J.B. Detective Gehring[-Cook] interviewed Mother, and also sat in while Diane Bower[s] [(Bowers)], who was a child interviewer for the child advocacy center, interviewed J.B. On February 1, 2008, Detective Gehring[-Cook] also conducted interviews with Hampton, Glasco, and Mother's sister[--Ayesha Rivers (Rivers)].[1]

*Hampton v. State*, 921 N.E.2d 27, 28 (Ind. Ct. App. 2010) (internal citations omitted), *reh'g denied, trans. denied*.

[1] On February 22, 2008, the State filed an Information, charging Hampton with Count I, child molesting, a Class A felony, Ind. Code § 35-42-4-3(a)(1) (2007); and Count II, child molesting, a Class C felony, I.C. § 35-42-4-3(b) (2007). The Information alleged that between July 1, 2007, and January 12, 2008, Hampton performed or submitted to deviate sexual conduct with, as well as fondling or

---

[1] During her interview, Rivers indicated that her own daughter, D.B.—*i.e.*, J.B.'s cousin—had also reported having been touched inappropriately by Hampton. Following an interview with D.B., Detective Gehring-Cook elected not to pursue criminal charges, concluding that D.B.'s statements were based on conversations she had overheard rather than her actual experience.

touching of, J.B.  On March 12, 2008, a Public Defender was appointed to represent Hampton, and he proceeded to conduct depositions and prepare a defense.  On September 19, 2008, at a hearing where Hampton was represented by his Public Defender, Hampton, after being informed of his "absolute constitutional right to[] a trial by jury[,]" declared that he wished to have the matter decided by a bench trial.  (Waiver Hrg. Tr. p. 6).  The trial court found that Hampton "knowingly and intelligently and voluntarily waived his right to a jury trial." (Waiver Hrg. Tr. pp. 7-8).

[2]     On November 12, 2008, Hampton replaced his Public Defender with Private Counsel.  The day prior to the start of trial, on May 7, 2009, Hampton's Private Counsel moved to withdraw, stating that Hampton had fired him and intended to retain new counsel.  A motion for a thirty-day continuance accompanied the withdrawal motion.  That same day, the trial court denied Private Counsel's request to withdraw because the new attorney had not yet entered an appearance on Hampton's behalf, and—as the case had already been continued numerous times—the trial court refused to delay the trial any further.

[3]     On May 8, 2009, the trial court conducted a bench trial.  The State's case centered on the testimony of J.B., who stated unequivocally that Hampton "put his penis inside [her] butt." (Trial Tr. p. 14).  When the State rested its case-in-chief, Hampton moved for judgment on the evidence, which the trial court granted as to Count II only.  During his case-in-chief, Hampton presented a defense of actual innocence, arguing that J.B. had fabricated the molestation allegations after being coached by her mother, Sharon Bryant (Mother), as

revenge for Hampton's role in causing Mother to be evicted from an apartment. At the close of the evidence, the trial court found Hampton guilty of Count I, child molesting as a Class A felony. In rendering its verdict, the trial court stated that it found "the victim in this case is [a] very credible, very articulate, mature young lady who gave explicit details of what [Hampton] did to her." (Trial Tr. p. 111). On May 20, 2009, the trial court sentenced Hampton to the minimum term of twenty years for a Class A felony.

[4] Hampton subsequently declared his intent to appeal his conviction, so the trial court appointed Appellate Counsel to act on Hampton's behalf. On direct appeal, Appellate Counsel argued that the State had presented insufficient evidence to support Hampton's conviction, specifically contending that J.B.'s testimony was incredibly dubious. The State cross-appealed, asserting that the trial court had imposed an illegal sentence. On February 8, 2010, our court affirmed Hampton's conviction and his twenty-year sentence. *See Hampton*, 921 N.E.2d at 27. Based on the facts before our court, we concluded "that the testimony of seven-year-old J.B. was not so incredibly dubious or inherently improbable that no reasonable person could believe it." *Id.* at 29.

[5] On January 30, 2012, Hampton filed a *pro se* petition for post-conviction relief, and on August 8, 2012, Hampton's post-conviction attorney filed her appearance. While investigating grounds for post-conviction relief, Hampton's attorney discovered that Hampton's file did not include a copy of Detective Gehring-Cook's February 1, 2008 interview with Rivers. Thus, on May 23, 2013, Hampton filed a non-party request for Rivers' taped statement and also

served a subpoena *duces tecum* on Detective Gehring-Cook for a copy of the same. On May 31, 2013, Hampton received Rivers' statement, and after reviewing it, Hampton's attorney also discovered that Rivers' minor son, R.W. (*i.e.*, J.B.'s cousin), had been scheduled for an interview with Bowers at the Child Advocacy Center. Accordingly, on June 4, 2013, Hampton filed a non-party request for the taped statement of R.W, and on June 21, 2013, Hampton served a subpoena *duces tecum* on Bowers for a copy of the same.

[6] On July 19, 2013, the State filed a notice of discovery compliance, stating that it, along with the Child Advocacy Center and the Indianapolis Metropolitan Police Department, had "made all reasonable efforts to locate the requested statement[] [of R.W.,] and no such statement has been found[.] Moreover the State has not found any positive evidence that any such statement was ever taken." (Appellant's App. p. 73). On July 25, 2013, Hampton filed a motion to schedule an attorneys-only status conference, positing that, "[c]ontrary to the State's assertion, there is evidence R.[W].'s statement does exist. It is a material piece of evidence. If it is missing, then the State should explain what happened to it." (Appellant's App. p. 75). The post-conviction court denied Hampton's motion for a status conference on July 30, 2013.

[7] On August 5, 2013, Hampton, by counsel, filed a motion to amend his petition for post-conviction relief, which the post-conviction court granted on August 8, 2013. In his amended petition, Hampton alleged that the performance of both his trial and appellate counsel "fell below the reasonable standard of professional care for an attorney" and that "their mistakes prejudiced the

outcome of the proceedings because there is a 'reasonable probability' of a different outcome had his counselors performed adequately." (Appellant's App. p. 80).

[8] On August 14, 2013, Hampton filed another verified motion to schedule an attorneys-only status conference based on his contention that the State was withholding R.W.'s taped statement. The same day, Hampton also filed a motion for specific discovery to obtain a copy of R.W.'s statement. On August 22, 2013, the post-conviction court granted Hampton's request for an attorneys-only status conference and scheduled the matter for October 18, 2013; however, the post-conviction court held Hampton's motion for specific discovery under advisement pending the State's response. On September 16, 2013, the State filed a motion for a protective order, arguing that, despite its formal responses that it had unsuccessfully made all reasonable efforts to find R.W.'s statement, Hampton's counsel "has continued to call, annoy and harass the case detective and the detective's supervisors, including insinuating to the detective's supervisors[] that the case detective has not competently perform[ed] her job." (Appellant's App. p. 100). Accordingly, the State requested an order "[p]rotecting it from [Hampton's] further Motions for Discovery or any further discovery efforts in this matter, without further order from the [c]ourt." (Appellant's App. p. 100). The post-conviction court granted the State's motion for a protective order until the issue could be discussed at the status conference.

[9] At the status conference on October 18, 2013, the State explained to the post-conviction court that "everyone . . . who potentially could have [R.W.'s

statement] has made reasonable efforts to find it, all possible reasonable efforts to find it[,]" but the evidence indicates that the statement does not exist. (PCR Tr. p. 5). Accordingly, the post-conviction court determined that

> as an officer of the court, I believe that [Hampton's counsel has made a diligent effort to obtain the statement]. I also as an officer of the court believe [the prosecuting attorney] when he says that statement does not exist. Therefore, I'm going to assume that statement does not exist. I'm also going to instruct you then to stop pursuing the statement as you've been told it does not exist unless you have some definitive proof that it exists and [the State is] lying to you, in which case that opens up a whole nother [*sic*] can of worms as far as sanctions and such. I'm going to instruct you to stop pursuing it.

(PCR Tr. p. 7). On November 14, 2013, Hampton filed a Motion to Lift Protective Order and a Motion to Protect Evidence Against Loss, Alteration, and Destruction. On November 19, 2013, the post-conviction court denied Hampton's motion to lift the protective order, stating,

> [Counsel] mischaracterizes court[']s ruling in her motion. Court did <u>not</u> order [Counsel] to not seek [d]iscovery in this matter. Court granted State's motion for protective order after hearing evidence that the evidence [Counsel] seeks does not exist. The court ordered that Counsel not contact witness as the State has indicated said evidence did not exist. If there is evidence that the State has purposefully [misled] the court, it should be presented, otherwise court's previously granted order stands.

(Appellant's App. p. 136).

[10] On April 4, 2014, the post-conviction court conducted a hearing on Hampton's petition for post-conviction relief. On September 22, 2014, the post-conviction court denied Hampton's petition, supporting its decision with specific findings of fact and conclusions of law in accordance with Indiana Post-Conviction Rule 1(6). Specifically, the post-conviction court concluded that Hampton failed to establish that Public Defender, Private Counsel, and Appellate Counsel provided ineffective assistance of counsel.

[11] Hampton now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[12] Post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Pruitt v. State*, 903 N.E.2d 899, 905 (Ind. 2009), *reh'g denied*. In a post-conviction proceeding, the petitioner bears the burden of establishing the grounds for relief by a preponderance of the evidence. *Passwater v. State*, 989 N.E.2d 766, 770 (Ind. 2013) (citing Ind. Post-Conviction Rule 1(5)). Because Hampton appeals from denial of his petition for post-conviction relief, he "stands in the position of one appealing from a negative judgment." *Id.* Therefore, in order to prevail, Hampton "must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court." *Id.* On review, we accord no deference to the post-conviction court's legal conclusions, and we will reverse the post-conviction court's findings and judgment "only upon a showing of clear error—that which leaves us with a

definite and firm conviction that a mistake has been made." *Id.* (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000), *reh'g denied; cert. denied*, 534 U.S. 830 (2001)).

## II. *Ineffective Assistance of Counsel*

[13] Hampton claims that his conviction must be vacated because he received ineffective assistance of both trial and appellate counsel. A claim of ineffective assistance of counsel is premised on the Sixth Amendment to the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." At the outset, we note that "'counsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption.'" *Hinesley v. State*, 999 N.E.2d 975, 982 (Ind. Ct. App. 2013) (quoting *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002)), *reh'g denied, trans. denied*. To satisfy this burden, the United States Supreme Court has articulated a two-prong test for establishing ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984), *reh'g denied*. The two prongs of the *Strickland* test "present independent inquiries, either of which may be sufficient for disposing of a claim." *State v. McManus*, 868 N.E.2d 778, 790 (Ind. 2007), *reh'g denied; cert. denied*, 552 U.S. 1298 (2008).

[14] First, under *Strickland*, "a defendant must show that counsel's performance was deficient." *Passwater*, 989 N.E.2d at 770 (citing *Strickland*, 466 U.S. at 687). This prong requires the defendant to demonstrate "that counsel's representation fell below an objective standard of reasonableness and that counsel made errors

so serious that counsel was not functioning as 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687). "Second, a defendant must show that the deficient performance prejudiced the defense." *Id.* (citing *Strickland*, 466 U.S. at 687). For counsel's performance to be prejudicial, the errors must have been "so serious as to deprive the defendant of a fair trial, meaning a trial whose result is reliable." *Id.* (citing *Strickland*, 466 U.S. at 687). A defendant establishes prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694).

### A. *Ineffective Assistance of Trial Counsel: Public Defender*

Hampton first claims that the post-conviction court erroneously denied his petition for post-conviction relief because Public Defender's "performance violated the Sixth Amendment right to effective counsel and the Fourteenth Amendment right to a fair trial." (Appellant's Br. p. 14). More specifically, Hampton argues that Public Defender "failed to develop a theory of the case; investigate the case; talk to key witnesses; preserve [Hampton's] right to trial by jury of his peers; consult experts; and provide proper representation at the child

hearsay hearing." (Appellant's Br. p. 14). We will address each purported error in turn.[2]

### 1. *Failure to Develop a Theory of the Case*

Hampton first asserts that Public Defender "failed to develop a 'theory of the case.'" (Appellant's Br. p. 14). The post-conviction court concluded that Hampton's trial counsel acted reasonably by basing the defense on a theory of actual innocence, and our review of the record reveals that Hampton has steadfastly maintained his innocence throughout this case. On appeal, Hampton insists that a "bald assertion of innocence" was insufficient "to tell the story to the fact-finder and convince the fact-finder"; rather, Public Defender should have "put forth the facts which formed the foundation of the defense." (Appellant's Br. p. 15). We note that Public Defender represented Hampton *prior* to the bench trial—from March 12, 2008, until November 12, 2008. Thus, while he conducted depositions and began preparing the case for trial, Public Defender did not present the case to the fact-finder because he was represented by private counsel and, therefore, could not have been ineffective in such a respect.

---

[2] Hampton has not developed a cogent argument regarding his contention that Public Defender was ineffective by failing to consult experts; therefore, we find that he has waived this issue for appellate review. *See* Ind. Appellate Rule 46(A)(8)(a).

## 2. *Failure to Investigate and Talk to Key Witnesses/Failure to Provide Adequate Representation at Child Hearsay Hearing*

Hampton next alleges that Public Defender was deficient by failing to investigate the case and talk to key witnesses. To establish a "failure to investigate as a ground for ineffective assistance of counsel requires going beyond the trial record to show what investigation, if undertaken, would have produced." *McKnight v. State*, 1 N.E.3d 193, 201 (Ind. Ct. App. 2013) (citing *Woods v. State*, 701 N.E.2d 1208, 1214 (Ind. 1998), *reh'g denied; cert. denied*, 528 U.S. 861 (1999)). "This is necessary because success on the prejudice prong of an ineffectiveness claim requires a showing of a reasonable probability of affecting the result." *Id.* (quoting *Woods*, 701 N.E.2d at 1214).

Here, the post-conviction court found that Public Defender's "investigation of the case was sufficient" as he conducted depositions of several State witnesses, and Hampton failed to demonstrate how further investigation would have resulted in his acquittal. (Appellant's App. p. 198). In turn, Hampton argues that Bowers, the forensic interviewer who conducted J.B.'s interview at the Child Advocacy Center, "was an essential witness for the child hearsay hearing[,]" but Public Defender "spontaneously decided to stipulate to the admission of the videotape of the January 18, 2008 interview." (Appellant's Br. p. 15). Hampton posits that "[t]here was no strategic reason" behind Public Defender's failure to interview or depose Bowers or subject her to cross-examination at the child hearsay hearing. (Appellant's Br. p. 15).

[19] Hampton's appellate brief is devoid of any cogent argument regarding what Public Defender would have discovered by interviewing Bowers or how it would have affected the outcome of his case. Instead, he cursorily suggests that because "the child witness may have been 'coached' it [was] imperative to show how such coaching (either deliberate or inadvertent) could happen." (Appellant's Br. p. 17). While Public Defender stipulated to the admission of J.B.'s interview for purposes of the child hearsay hearing only, J.B.'s recorded statements were not admitted during the bench trial, and Bowers did not testify. Rather, the State presented evidence of J.B.'s allegations against Hampton through J.B.'s direct testimony, which the trial court explicitly found to be credible. Moreover, although Hampton called Bowers to testify at the post-conviction hearing, he did not question her regarding the content of J.B.'s videotaped interview or her impressions thereof—*i.e.*, whether there was "[e]vidence of coaching." (Appellant's Reply Br. p. 3). Accordingly, we cannot say that Public Defender's decision to stipulate to the videotaped interview at the child hearsay hearing without interviewing, deposing, or cross-examining Bowers was deficient, let alone prejudicial to the outcome of Hampton's case.

### 3. *Waiver of Right to Jury Trial*

[20] Hampton concedes that he knowingly, intelligently, and voluntarily waived his right to a jury trial as the post-conviction court determined, but "he does not know why his [P]ublic [D]efender would have recommended this tack." (Appellant's Br. p. 16). According to Hampton, Public Defender "was remiss in recommending waiving such an important and fundamental right given the

circumstances and what was at stake." (Appellant's Br. pp. 16-17). However, Hampton does not expand his argument to explain how his informed decision to proceed with a bench trial rather than a jury trial constituted ineffective assistance.

[21] Our supreme court has previously found that waiving a jury trial is part of an attorney's strategic decision-making discretion. *See Coleman v. State*, 694 N.E.2d 269, 276 (Ind. 1998). "On appeal, we do not second guess counsel's strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests." *Elisea v. State*, 777 N.E.2d 46, 50 (Ind. Ct. App. 2002). Public Defender did not testify during the post-conviction hearing; instead, he submitted an affidavit to the post-conviction court stating that he did "not have any independent recollection of strategic decisions made in this case or the evidence in this case and would defer to what is recorded in the file." (Appellant's App. p. 223). Nevertheless, "courts should not insist that attorneys 'confirm every aspect of the strategic basis for his or her actions.'" *Hinesley*, 999 N.E.2d at 985 (quoting *Harrington v. Richter*, 562 U.S. 86, 109 (2011)). Hampton bears the burden of showing that Public Defender's performance was deficient, and because he presented no evidence pertaining to the advice he received from Public Defender as to why a bench trial would be more suitable for the facts of this case than a jury trial, we will not disturb the post-conviction court's finding that Public Defender was not ineffective by making a "strategic decision to waive the jury trial." (Appellant's App. p. 200).

## B. *Ineffective Assistance of Trial Counsel: Private Counsel*

[22] Second, Hampton claims that the post-conviction court clearly erred in denying his post-conviction relief petition because of the ineffective representation provided by Private Counsel. Similar to the allegations of ineffectiveness raised with respect to Public Defender, Hampton contends that Private Counsel "failed to investigate the case and talk to key witnesses, preserve [Hampton's] right to trial by jury of his peers, consult experts, and provide proper representation at the bench trial and sentencing hearing." (Appellant's Br. p. 18). We will again address each purported error in turn.

### 1. *Failure to Investigate the Case and Talk to Key Witnesses*

[23] Without providing any context or a cogent argument, Hampton vaguely asserts that Private Counsel "failed to investigate the case and talk to key witnesses" by not speaking with Bowers; by not taking any additional statements subsequent to Public Defender's depositions; by not remembering Rivers' role in the case or "the substance of what she would have testified to"; and by presenting only two witnesses during Hampton's case-in-chief. (Appellant's Br. p. 18). The post-conviction court determined that Hampton's

> claim that [Private Counsel] also failed to investigate the case to the level of ineffectiveness also is found to be without merit. While the depositions were completed by the time [Private Counsel] took the case over, he stated that he familiarized himself with the file from [Public Defender], and prepared a witness list, and based on speaking to his client, the witnesses, and reviewing the file, was able to develop a theory of the case.

(Appellant's App. p. 198).

[24] "The *Strickland* ineffective assistance of counsel standard 'require[s] no special amplification in order to define counsel's duty to investigate.'" *Wilkes v. State*, 984 N.E.2d 1236, 1241 (Ind. 2013) (quoting *Strickland*, 466 U.S. at 690). "In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Based on Hampton's perfunctory argument, we discern no basis for reversing the post-conviction court's finding that Private Counsel rendered effective assistance of counsel with respect to the investigation of the case.

## 2. *Waiver of Right to Jury Trial*

[25] Hampton next contends that Private Counsel provided ineffective assistance of counsel because he "discarded the idea of recommending a withdrawal of the jury trial waiver because he felt it would be 'insurmountable.'" (Appellant's Br. p. 19). However, Hampton does not develop his argument any further to articulate how Private Counsel was deficient or how the decision to proceed with a bench trial prejudiced Hampton. As a result, we find that he has waived this issue for appellate review. *See* App. R. 46(A)(8)(a).

## 3. *Consultation of Experts and Other Materials*

[26] Hampton also asserts that Private Counsel was ineffective because he failed to consult any experts in this case, attend Continuing Legal Education (CLE) courses, or read any books about child hearsay issues. According to Hampton,

"[y]ounger children (those aged six and younger) are especially prone to suggested memories, especially with 'suggestive interviews.'" (Appellant's Br. p. 27). During the bench trial, Private Counsel argued that Mother coached J.B.'s allegations, as evidenced by the fact that J.B.

> clearly used words that were not age suitable and she obviously learned those from somebody else and I'm guessing whoever taught her those words, all of a sudden what she referred to as a dick [during the child interview] is now a penis [at trial], and somebody [has] been talking to her, the child said she'd been talked to—she went over her testimony before the trial and we heard evidence that she went over and talked about what she was going to say before the hearing on the child [h]earsay [s]tatute and before her deposition[.] [Mother] indicated in her deposition that she talked all morning, all afternoon or all day, something like that, the day before, and then the morning of, one of these statements, so clearly the child's been talked to.

(Trial Tr. p. 106). Hampton now argues that "[P]rivate [C]ounsel did not come up with a plausible reason how the words 'were suggested'" and should have consulted an expert, reviewed treatises, or attended CLE courses in order "to support his haphazard conclusions." (Appellant's Br. p. 27).

At the post-conviction hearing, Private Counsel testified that he reviewed statutes and case law pertaining to child hearsay issues in preparation for the trial. On appeal, Hampton does not articulate how any particular expert, treatise, or CLE course would have convinced the trial court that J.B.'s testimony was unreliable. During the post-conviction hearing, Hampton presented no evidence from any expert to specifically demonstrate that J.B. had,

in fact, been coached. Hampton also contends that Private Counsel should have called Bowers to testify at the bench trial "because the [forensic child] interview itself contained the evidence necessary for supporting the claim of implanted memories"; yet, he asked no questions of Bowers at the post-conviction hearing to support this claim. (Appellant's Br. p. 27). As such, "[i]t is at best wholly speculative" that the testimony of Bowers or any other expert "would have affected the outcome of the trial." *Harrison v. State*, 707 N.E.2d 767, 779 (Ind. 1999), *reh'g denied; cert. denied*, 529 U.S. 1088 (2000).

[28] Moreover, at the bench trial, Detective Gehring-Cook testified that, during her five years as a child abuse detective, she had worked on at least 125 child abuse cases and participated in numerous interviews, and she observed Bowers' interview with J.B. Based on her experience, Detective Gehring-Cook testified that "it's very common" for children to change the terminology they use for different body parts, and often "the child is unable to give an exact date [of the incident] . . . not because of them being smart or dumb or anything like that, it's just an age [in]appropriate question and they're not able to answer that type of a question." (Trial Tr. pp. 50, 60). During cross-examination, Private Counsel delved into the defense's theory that J.B.'s allegations had been coached by Mother, but Detective Gehring-Cook disagreed, stating:

> It's very difficult to coach [children] when they come up with details, a lot of parents when a child is coached they're able to say like, well, yeah, he molested me or he raped me or something. But they can't go into the details, the finer details of describing things[] that would be not normally known to a seven

year old, such as . . . the victim said in this [case], the greasiness of [Hampton's] penis.

(Trial Tr. p. 62). In a further attempt to demonstrate that Mother had inappropriately influenced J.B., Private Counsel asked if it was "kind of unusual for a child of [J.B.'s] age" to be using the word "dick." (Trial Tr. p. 64). Again, Detective Gehring-Cook responded that there was nothing suspicious about the language utilized by J.B. as she has

> heard everything from dick, penis, cock, twigs and berries from kids from ages from three and up. They use all different words and who knows where they pick them up. You know, the guy— the kid that did—with twigs and berries he picked it up from a movie, whatever—Austin Powers, you know, kids pick it up, they hear different words.

(Trial Tr. pp. 64-65). As the trial court could have relied on Detective Gehring-Cook's testimony even if presented with hypothetical contradictory evidence, we cannot say that there is a reasonable probability of a different outcome.

### 4. Failure to Provide Adequate Representation at Bench Trial

[29] Finally, Hampton contends that Private Counsel "failed to professionally represent Hampton" at the bench trial. (Appellant's Br. p. 19). Private Counsel confirmed at the post-conviction hearing that Hampton "vehemently denied the allegations" so his defense strategy was based on a theory of innocence. (PCR Tr. p. 39). Also, Private Counsel recalled that "there may have been motivation" for Mother to coach J.B. into fabricating the allegations as a means of retaliating against Hampton. (PCR Tr. p. 39). Hampton now insists that

"[i]f [Private Counsel] truly believed Hampton was innocent, then he needed to show the trial court how the State's witness's allegations were implausible and why and how the defense's theory of the case was sound." (Appellant's Br. p. 20). Hampton further contends that "the [r]ecord makes clear [P]rivate [C]ounsel did not have his basic facts straight, was unprepared for trial, and failed to use the factual and legal tools which were readily available to him." (Appellant's Br. p. 20) (footnote omitted).[3]

[30] During the bench trial, Hampton testified that prior to J.B.'s allegations, Glasco had co-signed a lease on a one-bedroom apartment for Rivers and her children. At some point unbeknownst to Hampton and Glasco, Mother, along with her boyfriend and J.B., moved into Rivers' apartment. In November or December of 2007, Hampton explained that they got a phone call in the middle of the night from Rivers, who was irate about all of the extra people living in her apartment. Hampton stated that he was concerned that Rivers would be evicted, so he told Mother that she (along with her boyfriend and J.B.) needed

---

[3] Rather than relying on *authoritative* citations to demonstrate that Private Counsel's performance was deficient, Hampton cites to Wikipedia and posits that "[t]he Kipling Method of investigation" makes it "painfully clear" that Private Counsel "was hopelessly asea [*sic*] when Hampton most needed counsel's guidance and help." (Appellant's Br. p. 20 & n.4). We find no merit in this argument. Furthermore, to the extent that Hampton merely identifies evidence not relied upon at trial—*i.e.*, D.B.'s child interview; discusses testimony that is contrary to Hampton's—*i.e.*, Mother's statements that she did not have any ill-will about being evicted from an apartment; and notes instances of mistaken factual references—*i.e.*, Private Counsel indicating that the molestation occurred in 2008 rather than 2007 and Detective Gehring-Cook's substitution of Rivers for Glasco in discussing the layout of Glasco and Hampton's home, we find that he has waived the issue for appellate review because he has not developed a cogent, well-cited argument that Private Counsel's performance was inadequate and prejudiced the outcome of his case. *See* App. R. 46(A)(8)(a). For the same reason, we do not address Hampton's footnoted claim that Private Counsel's "deficient performance is evident" based on his attempt to withdraw on the eve of the bench trial and that his only conversation with Glasco was an attempt to convince Hampton to accept a plea agreement. (Appellant's Br. p. 20).

to vacate the apartment or he would call the police. According to Hampton, his threat to call the police if Mother did not move out of Rivers' apartment angered Mother and caused her to seek revenge. However, because Hampton's testimony could have been "easily discard[ed] as 'self-serving[,]'" Hampton posits that "Glasco's testimony was crucial" to demonstrate that Mother had a motive for fabricating allegations through J.B. (Appellant's Br. p. 21). Yet, Glasco did not appear at the bench trial to testify, so Hampton contends that Private Counsel was ineffective for failing to subpoena her.

[31] It is well established that "a decision regarding what witnesses to call is a matter of trial strategy which an appellate court will not second-guess." *Curtis v. State*, 905 N.E.2d 410, 415 (Ind. Ct. App. 2009), *trans. denied*. As early as March 26, 2008, Glasco was identified as a witness on the defense's witness list. Glasco and Hampton had been in a relationship for nearly two decades; they lived together and maintained their relationship despite J.B.'s allegations. During the post-conviction hearing, Private Counsel testified that Glasco "indicated definitely a willingness to show up at trial[,]" so Private Counsel "was surprised when she didn't show up." (PCR Tr. pp. 35, 41). Although the nature of her relationship with Hampton indicates that Glasco would have appeared voluntarily at his trial, the burden is nevertheless on the defendant to "insur[e] that witnesses who may aid in his or her defense are called." *Montgomery v. State*, 804 N.E.2d 1217, 1221 (Ind. Ct. App. 2004), *trans. denied*. At the post-conviction hearing, Private Counsel could not recall "what she would have testified to," but as it is evident that Private Counsel intended to use Glasco's

testimony to aid in Hampton's defense, his failure to secure her presence at trial constitutes deficient performance. (PCR Tr. p. 41). *See Montgomery*, 804 N.E.2d at 1221 (finding trial counsel's failure to subpoena two of the State's expert witnesses, or request a continuance after the State did not call them, was deficient, and the defendant was prejudiced because "in what became essentially a 'battle of experts,' corroborating expert testimony would have been particularly powerful").

[32] Nonetheless, the post-conviction court determined that "from her testimony at the evidentiary hearing[,] it is apparent that Ms. Glasco's putative testimony at most would have been cumulative to testimony provided by [Hampton] himself. Therefore based on the available record, . . . Hampton has failed to establish that he was prejudiced by [Glasco's] absence from the trial." (Appellant's App. p. 201). In particular, Glasco explained that she could have corroborated Hampton's assertion that he wears brief-style underwear—not boxer shorts as J.B. alleged. Also, during the trial, the State presented a statement from Hampton that he had purchased a bike for J.B. as a Christmas present in 2007 in order to discredit Hampton's contention that he had a significant falling out with J.B.'s Mother in November of 2007. Glasco stated that she could have testified that, although Hampton contributed some money for the bicycle, she actually went to the store and picked it out. Additionally, Hampton points to Glasco's deposition, in which she corroborates Hampton's claim that J.B. was not at their home around Christmas-time when the molestation allegedly occurred.

[33]     We agree with the post-conviction court that Hampton has not demonstrated

that Glasco's testimony would have altered the outcome of the case.  The trial

court unequivocally stated that it did not find Hampton's testimony credible

"based on his demeanor and his inability to answer questions directly and

actually just his whole personal demeanor as he testified to the extent that

[Private Counsel] says that it's one witness's word against the others.  I

certainly find beyond a reasonable doubt that the victim in this case is credible."

(Trial Tr. pp. 111-12).  Furthermore, the trial court found that "the events that

[Hampton] said caused this all alleged fabrication occurred, prior to him, at

least at a minimum giving money to purchase a bicycle, I mean—so it just

doesn't make sense to me."  (Trial Tr. p. 111).  Thus, we cannot say that there

is a reasonable probability that Glasco's testimony about the boxer shorts and

the bicycle would have caused the trial court to entirely discredit J.B.'s

testimony.

[34]     Hampton also attacks Private Counsel's performance for failing to vigorously

impeach J.B. with her previous statements.  However, the post-conviction court

concluded that Private Counsel provided reasonably effective assistance as he

> extensively cross-examined the victim regarding her memory of
> the crimes, various factual inconsistencies and also regarding her
> and her [M]other's motives for lying.  Despite [Private Counsel]
> having highlighted what he viewed as problem areas, the court
> specifically found the victim to be credible, and it is difficult to
> see how addressing other specific issues would have provided the
> victim anything other than additional opportunities to reiterate
> her story.

(Appellant's App. pp. 202-03).  Throughout her child interview, deposition, the child hearsay hearing, and the bench trial, J.B. did not waver in her allegation that Hampton put his penis inside her butt.  At the beginning of the bench trial, J.B. indicated knowing the difference between a truth and a lie and answered that the consequence of lying in court is that "[y]ou will go to jail."  (Trial Tr. p. 12).  During cross-examination, Private Counsel attempted to establish that Mother coached J.B.'s story, but when specifically asked what Mother told her to say, J.B. answered, "She told me to tell the truth."  (Trial Tr. p. 24).

[35]  Hampton now argues that, during her deposition, J.B. "recanted her allegation and said she was 'making it up[,]'" and Private Counsel should have presented this "outright admission of fabrication" during the trial.  (Appellant's Br. p. 28).  Rather than following Hampton's lead of excerpting one line from J.B.'s deposition, we look to the statement in its full context:

> Q.    Well, let me ask you, I just want to make sure that you're telling the truth.  You're not—are you making any of this up, [J.B.], or is it all—did it all really happen?
> A.    I'm making it up.
> Q.    You're making the whole thing up?
> A.    Well, it really happened.
> Q.    It really happened.  Okay.  But are you telling the truth?
> A.    Yes.

(Appellant's Exh. B-2).  From this colloquy, it could easily be concluded that J.B. was confused by the language of the question rather than that she was recanting her allegation.  Thus, it was certainly reasonable for Private Counsel to elect not to impeach J.B. with this specific testimony.  *See Slusher v. State*, 823

N.E.2d 1219, 1221 (Ind. Ct. App. 2005) (Our court "'will not speculate as to what may or may not have been advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best.'") (quoting *Whitener v. State*, 696 N.E.2d 40, 42 (Ind. 1998)).[4]

## C.  *Ineffective Assistance of Appellate Counsel*

[36]  Third, Hampton claims that the post-conviction court erred in denying his petition for post-conviction relief because Appellate Counsel rendered ineffective assistance of counsel.  "The standard of review for a claim of ineffective assistance of appellate counsel is the same as for trial counsel."  *Ben-Yisrayl*, 729 N.E.2d at 106.  In general, ineffective assistance claims at the appellate level "fall into three basic categories:  (1) denial of access to an appeal, (2) waiver of issues, and (3) failure to present issues well."  *Ritchie v. State*, 875 N.E.2d 706, 723 (Ind. 2007), *reh'g denied*.

[37]  Rather than relying on any of the three recognized categories, Hampton contends that Appellate Counsel was ineffective by not invoking the *Davis/Hatton* procedure in light of the mistakes made by Public Defender and Private Counsel, and "[f]oregoing the procedure left [A]ppellate [C]ounsel with

---

[4] Similarly, Hampton also points to testimony from Mother's deposition indicating that J.B. had problems lying to her teacher and argues that "[n]o reasonably proficient attorney would fail to use such evidence at trial."  (Appellant's Br. pp. 28-29).  We first note that, again, Hampton has failed to provide the full context of Mother's statement, which actually states that J.B. developed several problems at school *after* reporting the molestation.  Second, a review of the transcript confirms that Private Counsel did, in fact, extensively question Mother during the bench trial about this line from her deposition.

an impaired sufficiency argument." (Appellant's Br. p. 31). The post-conviction court found Hampton's claim meritless "because of the [c]ourt's ruling regarding the effectiveness of his trial counsel. Since, as the [c]ourt has found, Hampton's trial counsel was not ineffective, it follows that Hampton's [A]ppellate [C]ounsel was not ineffective for failing to develop a more complete record." (Appellant's App. p. 204).

[38] Sometimes, in order to establish "substandard counsel performance" where issues "are not visible at all on the face of the trial record," additional investigation is necessary. *Slusher*, 823 N.E.2d at 1221-22. Thus, the *Davis/Hatton* procedure allows for "a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a postconviction relief petition to be pursued in the trial court." *State v. Lopez*, 676 N.E.2d 1063, 1069 (Ind. Ct. App. 1997), *trans. denied*. Subsequent to a full evidentiary hearing, if the petition for post-conviction relief is denied, "the appeal can be reinitiated." *Id.* Along with the issues initially raised in the appeal, the issues litigated in the post-conviction relief proceeding may also be raised. *Id.* By utilizing this procedure, "a full hearing and record on the issue will be included in the appeal"; whereas, appellate counsel would otherwise be "forced to rely solely on the trial record." *Id.*

[39] "We are highly deferential to [A]ppellate [C]ounsel's decisions in deciding what issues to raise on direct appeal." *Graham v. State*, 941 N.E.2d 1091, 1099 (Ind. Ct. App. 2011), *aff'd on reh'g*. Here, Appellate Counsel submitted an affidavit to the post-conviction court, averring that the record in Hampton's case "was very

sparse, and there was not much else to raise in the appeal other than sufficiency." (Appellant's App. p. 224). He further stated that he is "well-acquainted with the *Davis/Hatton* procedure (having worked for the Indiana Public Defender's office)," and although he did not specifically recall making the choice to forego the *Davis/Hatton* procedure, he "normally do[es] not use it and in general think[s] it is best to leave these issues to be hashed out in a post-conviction proceeding." (Appellant's App. p. 224). According to Hampton, our court rejected Appellate Counsel's incredibly dubious testimony argument on direct appeal, but if Appellate Counsel had expanded the record using the *Davis/Hatton* procedure, "there is a reasonable probability the outcome of the direct appeal would have been decided in Hampton's favor." (Appellant's Br. p. 31). Although it is not quite clear, Hampton appears to argue that if Appellate Counsel had accessed J.B.'s deposition, he could have successfully argued that her "testimony regarding the molestation was inherently contradictory or equivocal." (Appellant's Br. p. 31) (quoting *Hampton*, 921 N.E.2d at 29).

[40] This court has previously found that "[i]n determining whether appellate counsel's performance was deficient, we consider the information available in the trial record or otherwise known to appellate counsel. The role of appellate counsel should not be measured by information unknown to appellate counsel but later developed after the appeal by post-conviction counsel." *Seeley v. State*, 782 N.E.2d 1052, 1059 (Ind. Ct. App.) (internal citations omitted), *trans. denied; cert. denied*, 540 U.S. 1020 (2003). Furthermore, notwithstanding what

additional information Appellate Counsel may have garnered by suspending the appeal to pursue a post-conviction relief petition, we are not persuaded by Hampton's argument that the outcome of his appeal would have been any different. As we previously stated, J.B.'s statement in her deposition that "I'm making it up"—when read in context with her subsequent clarification that "it really happened" and that she was telling the truth does not establish that her testimony at the bench trial was incredibly dubious. (Appellant's Exh. B-2). Therefore, we find that Appellate Counsel did not render ineffective assistance of counsel by electing not to utilize the *Davis/Hatton* procedure.

### III. *Post-Conviction Discovery*

[41] Finally, Hampton claims that the post-conviction court abused its discretion by failing to order specific discovery and by imposing a protective order against Hampton's post-conviction counsel with respect to her efforts to obtain R.W.'s taped interview. In post-conviction proceedings, "[a]ll rules and statutes applicable in civil proceedings including pre-trial and discovery procedures are available to the parties." P-C.R. 1(5). In general, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject-matter involved in the pending action." Ind. Trial Rule 26(B)(1). Like trial courts, "post-conviction courts are given wide discretion in discovery matters and 'in determining what constitutes substantial compliance with discovery orders, and we will affirm their determinations as to violations and sanctions absent clear error and resulting prejudice.'" *McManus*, 868 N.E.2d at 790

(quoting *Dye v. State*, 717 N.E.2d 5, 10-11 (Ind. 1999), *reh'g denied; cert. denied*, 531 U.S. 957 (2000)).

[42] Pursuant to Indiana Trial Rule 34(A)(1), "[a]ny party may serve on any other party a request . . . to produce and permit the party making the request . . . to inspect and copy[] any designated documents or electronically stored information . . . *which are in the possession, custody or control of the party upon whom the request is served*" (emphasis added). The discovery rules additionally provide that "[u]pon motion by any party . . . and for good cause shown," the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including, in part, "that the discovery not be had[,] . . . that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters." T.R. 26(C)(1),(4). In this case, despite the State's assurances that it did not possess, and was unaware of the existence of, Bowers' taped interview with R.W., Hampton continued to demand the evidence from Detective Gehring-Cook and others. As a result, the post-conviction court granted the State's request for a protective order to instruct Hampton to stop pursing the statement. Hampton now contends that

> [t]he defense was hamstringed by the protective order, and given the fact Hampton's theory of defense was Glasco's family sought to exact revenge upon him due to the falling out over the apartment, the evidence was relevant and discoverable. To deny Hampton the evidence was unfair, and it should have been discovered in the first place before the May 8, 2009 bench trial.

(Appellant's Br. p. 36).

[43] At the post-conviction hearing, Bowers reviewed an intake form from the Child Advocacy Center that she had prepared, which indicated that R.W. was pre-scheduled for an interview on January 18, 2008—the same day as her interviews with J.B. and D.B. The referral information on the intake form provided simply that "[R.W.'s] sister alleges [Hampton] had touched her. [The Department of Child Services (DCS)] needs [R.W.] interviewed, too." (Appellant's App. p. 501). Thus, Bowers testified that she personally interviewed R.W., and she wrote "N.D." on R.W.'s intake form to denote that R.W. did not disclose any abuse. (Appellant's App. p. 501). Bowers further testified that the taped interviews of J.B. and D.B. were given to Detective Gehring-Cook, whereas R.W.'s interview was provided to a DCS family case manager, Lucita Exom-Pope (FCM Exom-Pope), because R.W. did not make any allegations of abuse.

[44] Nonetheless, there is also evidence that although R.W. was scheduled to be interviewed, the interview may never have actually occurred. During Bowers' interview with Rivers' daughter, D.B. (who is R.W.'s younger sister and J.B.'s cousin), Bowers inquired as to why R.W. did not accompany D.B. to the interview. D.B. answered that R.W. was at school. Also that day, while speaking to Rivers, Bowers indicated that DCS still needed to interview R.W. Rivers indicated that she "thought [she] just needed [D.B.] here" or she "would have kept [R.W.] out of school." (Appellant's Exh. I). In addition, Hampton submitted an affidavit of FCM Exom-Pope at the post-conviction hearing, who

averred that "DCS has no electronic or written records of reports or notes pertaining to any of the other children regarding the [J.B.] investigation, that have not been provided to [Hampton's post-conviction attorney], including the children [D.B.] and [R.W.]." (Appellant's App. p. 476). Detective Gehring-Cook testified at the post-conviction hearing that she did not interview R.W., nor did she recall that any children other than J.B. and D.B. were interviewed by Bowers. There is no evidence that R.W.'s interview was rescheduled for a later date.

[45] The State is only capable of discovering evidence that is in its "possession, custody or control." T.R. 34(A)(1). Our deference to the trial court's credibility determinations is well established, and in this case, the trial court believed the State's claim that it "made all reasonable efforts to locate the requested statement, and no such statement has been found[.] Moreover the State has not found any positive evidence that any such statement was ever taken." (Appellant's App. p. 73). Accordingly, we cannot say that the trial court abused its discretion by granting the State's protective order and by not compelling specific discovery.

## CONCLUSION

[46] Based on the foregoing, we conclude that the post-conviction court properly denied Hampton's petition for post-conviction relief because he received adequate assistance of counsel at both the trial and appellate level. We further conclude that the post-conviction court acted within its discretion concerning the parties' discovery dispute over R.W.'s alleged statement.

[47] Affirmed.

[48] Vaidik, C. J. and Brown, J. concur